IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CAROL HOOGENBOOM, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-4663 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| THE TRUSTEES OF ALLIED SERVICES DIVISION WELFARE FUND, | ) ) ) | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

Carol Hoogenboom ("Plaintiff") brings this action against The Trustees of Allied Services Division Welfare Fund ("Defendant") arising out of Defendant's processing of her claims under an ERISA-covered benefit plan. Defendant moved to dismiss all claims [8]. For the reasons stated below, Defendant's motion [8] is denied in part and granted in part. However, after considering Defendant's motion, only a state-law claim remains, and the Court declines to exercise supplemental jurisdiction. Therefore, all claims in Plaintiff's complaint are dismissed without prejudice. The Court gives Plaintiff leave to file an amended complaint no later than July 9, 2021 if she can do so consistent with this opinion. This case is set for a telephonic status hearing on July 15, 2021 at 9:00 a.m.

**I.    Background[1]**

Plaintiff is a licensed psychologist practicing in Illinois. [1-1, at ¶ 1]. Defendant is a business operating in Illinois, and it contracted with BNSF Railway Company ("BNSF") and/or HealthCare Services Corporation to administer a portion of BNSF's benefits plan (the "Plan").

---

[1] The Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

[*Id.*, at ¶¶ 5, 11]. From in 2014–2017, Plaintiff provided psychological services for a family that was eligible for benefits and covered by the terms of the Plan. [*Id.*, at ¶¶ 9, 12, 14, 74]. The complaint alleges that the family assigned their rights to benefits to Plaintiff. [*Id.*, at ¶ 48]. Defendant confirmed it was the primary carrier for the claims submitted either by the family directly or on behalf of the family by Plaintiff. [*Id.*, at ¶ 13]. Plaintiff submitted her bills for a family member's treatment to BlueCross BlueShield of Illinois (BCBS), which then referred the claims to Defendant; she conformed her bills to industry practice and professional standards for psychological services. [*Id.*, at ¶¶ 18–19].

During 2014, BCBS and/or Defendant issued Plaintiff payments for the services she provided the family. [*Id.*, at ¶ 21]. However, sometime in 2015, Defendant directed BCBS to stop issuing payments to Plaintiff. [*Id.*, at ¶ 22]. Defendant directed Plaintiff to resubmit her bills using a different procedure code for family therapy despite industry practice that such therapy be individually billed and despite the fact that Defendant previously paid the claims using individual therapy procedure codes. [*Id.*, at ¶ 23]. Defendant "stated it would pay if the bills were resubmitted using the family codes." [*Id.*]. Plaintiff resubmitted her bills suing the guidelines required by Defendant. [*Id.*, at ¶ 24].

Also in 2015, Defendant contended that it made a $781.56 overpayment to Plaintiff for services provided on March 11, 2015 and April 8, 2015. [*Id.*, at ¶ 25]. It refused to make any more payments on Plaintiff's claims and "stated that it would process her claims when she refunded the overpayment." [*Id.*, at ¶ 25]. However, there was no overpayment because "the matter involved a dispute over the proper" billing codes "and not whether the services were rendered or were covered, and the dispute was resolved when the bills were resubmitted with the" billing codes required by Defendant. [*Id.*, at ¶ 26]. Defendant used the allegations about the

2

overpayment to withhold all benefits due to Plaintiff despite the fact that the new claims for benefits exceeded the alleged overpayment by many thousands of dollars. [*Id.*, at ¶ 27]. In August 2019, two years after she stopped providing services to Defendant, Plaintiff sent Defendant a money order for $781.56. [*Id.*, at ¶ 74, 84].

Defendant also made false statements about Plaintiff's bills, including alleging that she was billing for telephone calls and emails. [*Id.*, at ¶ 33]. However, Plaintiff did not submit any claims for unbillable telephone calls or emails; instead, she "submitted claims for prolonged therapy services which included paperwork, filing, progress notes, analysis, and telephone calls." [*Id.*, at 34]. Moreover, "billing for services including a telephone call is not a reason to deny an entire claim for service or a whole course of treatment over multiple claims." [*Id.*].

Defendant also engaged in a practice of delaying and obstructing the administration of claims, "including refusing to pay claims where there was no denial, refusing to supply information, and pretending not to be present when answering the telephone" when Plaintiff or the family called. [*Id.*, at ¶ 28]. Defendant repeatedly asked for more information about the claims, including the confidential progress notes kept by Plaintiff. [*Id.*, at ¶ 29]. Plaintiff provided these notes to Defendant, and the notes verified that she had rendered services to the family on the dates for which she submitted claims. [*Id.*, at ¶¶ 30–31]. Throughout 2015 and 2016, Defendant continued to refuse to pay benefits, stating that it was waiting for more information. [*Id.*, at ¶ 35]. However, Plaintiff had already submitted the information requested by Defendant. [*Id.*, at ¶ 36]. Defendant also required Plaintiff to repeatedly resubmit her bills and progress notes, even after stating that it had received the progress notes. [*Id.*, at ¶ 40]. Defendant refused to respond to inquiries about the status of the bills, refused to supply the list of claims for which it is withholding benefits, and refused to state what information was lacking to resolve the claims. [*Id.*, at ¶¶ 41,

44].

Defendant engaged in other tactics against Plaintiff, including refusing "to explain why checks were detached from Explanations Of Benefits forms before they were mailed to her" and refusing "to account for all the payments she received." [*Id.*, at ¶ 42]. In 2015 and 2016, Defendant "sent partial explanation of benefit letters in envelops with falsely dated postage marks." [*Id.*, at ¶ 43]. Defendant also told Plaintiff that she cannot appeal her claims cannot because they are not yet denied, only in a closed status waiting for more information. [*Id.*, at ¶¶ 35, 45].

Finally, Defendant asked the family to stop seeing Plaintiff, caused the family stress by refusing to process Plaintiff's bills, and told the family false information about Plaintiff. [*Id.*, at ¶¶ 68, 72]. The family benefitted and believed it benefitted from Plaintiff's services, and they wanted to continue their relationship with Plaintiff. [*Id.*, at ¶ 71]. A family member "missed appointments because of stress created by" Defendant "and in 2017 [the family] stopped coming for their appointments." [*Id.*, at ¶ 74].

From 2014 to 2017, Plaintiff submitted bills for at least fifty dates of services, and the billable amount of her claims exceeds $50,000. [*Id.*, at ¶ 46]. Defendant told Plaintiff that her "services were covered," and Plaintiff relied upon the "statements that her services were covered and continued to treat the patients." [*Id.*, at ¶¶ 79–80]. Defendant has yet to process Plaintiff's claims. [*Id.*, at ¶85].

In June 2020, Plaintiff filed a complaint in the Circuit Court of Cook County. [See 1-1]. In it, she alleges (1) breach of contract, (2) vexations delay and bad faith pursuant to the Illinois Insurance Code, (3) breach of fiduciary duty, (4) that she is entitled to equitable relief, (5) interference with contract, and (6) promissory estoppel. Defendant removed the complaint to this Court, claiming that all six of Plaintiff's state-law claims are preempted by the Employee

Retirement Income Security Act of 1974 ("ERISA"). [See 1, at 3–7]. Shortly thereafter, Defendant filed a motion to dismiss. [8].

## II. Legal Standard

### A. Motion to Dismiss Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint typically must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S at 555). In determining whether the complaint meets this standard, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth*, 507 F.3d at 618.

### B. ERISA Preemption

State-law claims may be preempted under ERISA under either § 502 or § 514[2]. An "individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)" if the "individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004). Section 514(a) states that ERISA preempts "any

---

[2] As is common practice, the Court cites to ERISA provisions based on their location in the Act as opposed to their United States Code citation. See *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Tr. Fund*, 538 F.3d 594, 597 n.2 (7th Cir. 2008). For clarity, ERISA § 502 corresponds to 29 U.S.C. § 1132 and ERISA § 514 corresponds with 29 U.S.C. § 1144.

and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered under ERISA. 29 U.S.C. § 1144(a). "The structure and legislative history indicate that the words 'relate to' are intended to apply in their broadest sense." *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Neurobehavioral Assocs., P.A.*, 53 F.3d 172, 174 (7th Cir. 1995). "Therefore, ERISA 'preempts a state law claim if the claim requires the court to interpret or apply the terms of an employee benefit plan.'" *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 931 (7th Cir. 2018) (quoting *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 504 (7th Cir. 2011)).

## III. Analysis

### A. Jurisdiction

Defendant removed this lawsuit based on ERISA preemption. Although preemption does not typically give rise to a federal question, complete preemption does. *Rice v. Panchal*, 65 F.3d 637, 639 (7th Cir. 1995), as amended on denial of reh'g (Nov. 6, 1995). As explained above, complete preemption requires that the plaintiff could have brought a claim under § 502. Providers can bring claims under § 502(a) as assignees. See *Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 53 F.3d at 173–74. However, in reply to Plaintiff's suggestion that she be given leave to bring a claim under § 502, Defendant argued that Plaintiff does not have standing to bring any claims under ERISA. [15, at 13]. In doing so, Defendant attached a copy of the Plan.[3] The Plan states: "You cannot 'assign' your rights or the payment of benefits to a provider. The Fund, however, will treat any document attempting to assign rights to a provider to be an authorization for direct payment by the Fund to the provider." [15-1, at 5]. Every circuit to have considered the

---

[3] The Court may consider the contents of the Plan on this motion to dismiss because the Plan is central to the complaint and referred to in it. See *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017).

issue has found that anti-assignment clauses in ERISA-covered plans are enforceable. See *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 453 (3d Cir. 2018) (finding an anti-assignment clause enforceable against provider and noting that it joins the First, Second, Fifth, Tenth, Ninth, and Eleventh Circuits in doing so). Concerned with the impact of the anti-assignment clause on subject matter jurisdiction, the Court requested supplemental briefing. [16].

Both parties argue that the Court has jurisdiction. [17;18]. In her brief, Plaintiff contests the enforceability of the anti-assignment clause, in part arguing that, through its conduct, Defendant waived any right to enforce the clause. [17, at 7–8]. When determining subject-matter jurisdiction, a "district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue." *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993) (quoting *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979)). However, "[w]hen the existence of subject matter jurisdiction goes to or is closely intertwined with the merits of the case, it is often appropriate to postpone ruling on the jurisdictional issue until after further factual development * * *." *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers Loc. 1 v. Kirk & Blum Mfg. Co., Inc.*, 2010 WL 11655414, at *2 (N.D. Ill. Feb. 25, 2010); see also *Collins v. United States*, 2005 WL 946896, at *5 (N.D. Ill. Apr. 19, 2005); *Kolovitz v. United States*, 1995 WL 32612, at *2 (N.D. Ill. Jan. 26, 1995). Here, some of Plaintiff's claims, such as breach of contract, depend on her ability to assert rights under the plan, which in turn depends on the enforceability of the anti-assignment clause. Accordingly, at this stage, the Court has subject matter jurisdiction to consider Defendant's motion to dismiss.[4]

---

[4] The Court makes no determination as to whether the enforceability of the anti-assignment clause could be determined on any future motion to dismiss should the Plaintiff file and amended complaint. The Court

### B. Plaintiff's Public Policy Argument

In a section titled "Public Policy concerns," Plaintiff discusses the federal Mental Health Parity Act, 29 U.S.C. 1185a. [14, at 6–7]. This law "requires group health plans to provide the same aggregate benefits for mental healthcare as they do for medical and surgical benefits." *Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 827 (N.D. Ill. 2019). Plaintiff explains that "[t]his Parity Act section of ERISA does not preempt State law." [14, at 6]. Her argument on this point is not entirely clear, as Defendant does not argue that the Parity Act preempts Plaintiff's state-law claims. Instead, Defendant argues that Plaintiff's claims are preempted under § 502 or § 514. Further, the Parity Act is included in Part 7 of ERISA, and this part also states that "[n]othing in this part shall be construed to affect or modify the provisions of section 1144 of this title[, which is ERISA § 514,] with respect to group health plans." 29 U.S.C.A. § 1191. In this portion of her brief, Plaintiff also cites to cases that she claims "held that a third party administrator of a self-funded health plan may be sued under ERISA sec. 502(a)(1)(B)." [14, at 7]. However, it is unclear how these cases support Plaintiff's preemption arguments here, particularly when whether a plaintiff could bring a claim under § 502(a)(1)(B) is part of the preemption analysis outlined in *Davila*. Accordingly, the Court is not persuaded by Plaintiff's public policy arguments.

### C. Promissory Estoppel

Plaintiff alleges that Defendant made three promises to her: (1) that "the services were covered" [1-1, at ¶¶ 79]; (2) that "it would pay if the bills were resubmitted using the family codes" [*id.* at ¶¶ 23, 77]; and (3) "that it would process her claims when she refunded the overpayment" [*id.* at ¶¶ 25, 83]. She alleges that she relied on these promises when deciding to continue to provide services to the family. [*Id.*, at ¶ 80]. Defendant argues that Plaintiff's complaint fails to

---

determines only that it is inappropriate to determine the enforceability of the anti-assignment clause at this point.

8

state a promissory estoppel claim and, in the alternative, any promissory estoppel claim is preempted by ERISA.

1. **Stating a Claim**

To establish a promissory estoppel claim, Plaintiff "must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523–24 (Ill. 2009). "Plaintiff's reliance must be reasonable and justifiable." *Quake Const., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990). Defendant argues that Plaintiff "fails to allege an unambiguous promise and fails to allege reasonable reliance." [9, at 12]. In doing so, Defendant ascribes two promises to Plaintiff's complaint: Defendant promised her that the services were covered and that it would process her claims once she refunded the overpayment. The Court notes that Plaintiff also alleges that Defendant promised to pay her bills once she resubmitted them using family codes. [1-1, at ¶¶ 25, 83]. Defendant also states that the "detriment she suffered appears to be that she has not been paid as much as she believes she was entitled to." [9, at 13]. It argues that the alleged promises were ambiguous because "she does not allege that the Fund promised what amount the Fund would pay for her services nor does she allege that the Fund ever denied claims for services she provided to the Fund's participants." [*Id.*]. However, courts frequently find that promissory estoppel claims alleging promises of coverage state a claim, even when those promises do not include promises for a specific amount of coverage. See, *e.g.*, *Advanced Ambulatory Surgical Ctr., Inc. v. Cigna Healthcare of Ill.*, 2014 WL 4914299, at *4 (N.D. Ill. Sept. 30, 2014) (finding that the plaintiff stated promissory estoppel claim based on allegation that plan assured the plaintiff that its "claims would be honored"); *Rehab. Inst. of Chi. v. Grp. Admins., Ltd.*, 844 F.

9

Supp. 1275, 1278–79 (N.D. Ill. 1994) (finding that the plaintiff stated promissory estoppel claim based on allegation that plan stated that "coverage was available"). Further, Defendant's argument misconstrues Plaintiff's complaint. Read in the light most favorable to Plaintiff, the complaint does not allege that the detriment Plaintiff suffered was failing to receive a specific dollar amount. Instead, Plaintiff alleges that Defendant ceased processing her claims altogether, and that Defendant did not begin to process the claims even after she resubmitted them with family billing codes and reimbursed the alleged overpayment. [1-1, at ¶¶ 77–85]. Accordingly, the alleged promises are not so ambiguous that Plaintiff's complaint fails to state a claim for promissory estoppel.

Next, Defendant argues that Plaintiff's allegations are inconsistent and that Plaintiff's reliance on any promises was not reasonable. [9, at 13–15]. Defendant specifically focuses on Plaintiff's allegations that Defendant informed her that it would process her claims if she resubmitted them using a family billing code, but that it then told her that it would not process her claims until she repaid an alleged overpayment for services provided from March 11, 2015, to April 8, 2015. [*Id.*]; see also [1-1, at a¶¶ 23, 25]. Plaintiff does not include the specific dates on which Defendant made these promises, but she alleged that both occurred in 2015. Plaintiff repaid the overpayment on August 20, 2019, after she stopped providing services to the patients. [1-1, at ¶¶ 74, 84]. Defendant argues that it was not reasonable for Plaintiff to rely on its promise that it would process the claims if she recoded the bills after Defendant informed her that it would not process the claims until she refunded the overpayment. The Court agrees. After Defendant told Plaintiff that it would not process her claims until after she refunded the alleged overpayment, it was unreasonable for Plaintiff to consider Defendant's previous promise that it would process her recoded claims in isolation. That is, after Defendant told Plaintiff she needed to refund the alleged

overpayment in order for it to process her claims, it was not reasonable for Plaintiff to expect Defendant to process her claims before she refunded the overpayment. It was also not reasonable for Plaintiff to continue to provide services to the patients and expect Defendant to process any related claims if she refunded the alleged overpayments in 2019, roughly four years after Defendant informed her of the alleged overpayments and roughly two years after she stopped treating the patients. Therefore, Plaintiff's complaint does not state a promissory estoppel claim with respect to any services Plaintiff provided after Defendant asked her to refund the overpayment. It does state a promissory estoppel claim with respect to any services Plaintiff provided between the two promises, that is, between when Defendant told her that it would process her claims after she recoded her bills and when Defendant told her that it would process her claims after she refunded the overpayment.

2. **Preemption**

Defendant also argues that even if Plaintiff's complaint states a promissory estoppel claim, the claim is preempted by ERISA. "Although ERISA's express preemption provision is broad, § 514(a) does not preempt state-law claims 'that make[ ] no reference to, or indeed function[ ] irrespective of, the existence of an ERISA plan.'" *Advanced Ambulatory Surgical Ctr., Inc.*, 2014 WL 4914299, at *3 (alterations in original) (quoting *Ingersoll-Rand v. McClendon*, 498 U.S. 133, 139 (1990)). A common form of promissory estoppel claim brought by a provider results from a plan informing a provider that a patient is covered under the plan, but then refusing to provide coverage. See, *e.g.*, *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Tr. Fund*, 538 F.3d 594, 596 (7th Cir. 2008); *Advanced Ambulatory Surgical Ctr., Inc.*, 2014 WL 4914299, at *3; *Oak Brook Surgical Ctr., Inc. v. Aetna, Inc.*, 863 F. Supp. 2d 724, 724 (N.D. Ill. 2012). Courts routinely find that such claims are not preempted because they "arise not from the

plan or its terms, but from the alleged oral representations made" to the provider. *Franciscan Skemp Healthcare, Inc.*, 538 F.3d at 597; *see also Advanced Ambulatory Surgical Ctr., Inc.*, 2014 WL 4914299, at *3; *Oak Brook Surgical Ctr., Inc.*, 863 F. Supp. 2d at 731.

Defendant argues that unlike these cases, Plaintiff's claim goes beyond whether the patients were covered and instead relates to whether Defendant "paid less than what the Plaintiff believes she is entitled to under the terms of the Plan." [9, at 11]. In doing so, it explains that if the promises "concerned the nature of the coverage under the plan—e.g., whether an illness was a pre-existing condition or whether a given procedure was covered under the policy—they do 'relate to' the plan for ERISA pre-emption purposes." *Parkside Lutheran Hosp. v. R.J. Zeltner & Assocs., Inc. ERISA Plan*, 788 F. Supp. 1002, 1007 (N.D. Ill. 1992). However, as explained above and reading the complaint in the light most favorably to Plaintiff, Plaintiff does not allege that Defendant should have made specific payments under the plan; instead she alleges that Defendant should have at least processed her claims once she resubmitted her claims with the appropriate codes. [1-1, at ¶ 85]. That is, Plaintiff is not alleging that Defendant inappropriately processed her claims or paid her too little; instead she alleges that it failed to process her claims at all despite telling her it would.

Defendant also argues that the Court would have to consider the Plan to determine whether Plaintiff suffered any harm because "the promise that 'services were covered' is an ambiguous promise that leaves unanswered the question of how much" the Plan would have paid. [9, at 11]. However, the Seventh Circuit rejected a similar argument in *Franciscan Skemp Healthcare*. There, the provider called the plan to verify that plan's coverage of a patient and "the relevant services." *Franciscan Skemp Healthcare, Inc.*, 538 F.3d at 596. The plan "made oral representations that they were covered" but then denied coverage because the coverage was subject

12

to COBRA and was canceled retroactively. *Id.* The Seventh Circuit rejected the plan's argument that the promissory estoppel claim was preempted because the provider requested that it "pay 'to the extent said services would otherwise have been covered.'" *Id.* at 598. The court explained that the references to the plan were "solely for the purpose of identifying a damages amount; they do not convert the claims into ones for plan benefits." *Id.*

In sum, Defendant's arguments recast Plaintiff's complaint from one based on a promise of coverage and a promise that Defendant would process her claims to a complaint requesting specific payments as defined by the Plan. Because, reading the complaint in the light most favorable to Plaintiff, her promissory estoppel claim is based on the representations made to her by Defendant and not on the Plan, this claim is not preempted by ERISA. However, as explained below, the Court declines to exercise supplemental jurisdiction over the surviving portion of Plaintiff's promissory estoppel claim.

### D. Tortious Interference

Plaintiff alleges that Defendant tortiously interfered with a contract by telling the patients to not see her, by causing the patients stress by refusing to process her bills, and by telling them false information about her. [1-1, at ¶¶66–76]. As with the promissory estoppel claim, Defendant argues that Plaintiff fails to state a claim and that any claim is preempted by ERISA. On its first argument, Defendant notes that "the right to engage in a physician-patient relationship is not absolute but is instead terminable at will." *Olaf v. Christie Clinic Ass'n*, 558 N.E.2d 610, 613–14 (Ill. App. 1990); see also [9, at 12]. And, under "Illinois law, '[a] defendant's inducement of the cancellation of an at-will contract constitutes at most interference with a prospective economic advantage, not interference with contractual relations.'" *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (alteration in original) (quoting *Prudential Ins. Co. of Am. v. Sipula*, 776 F.2d 157, 162

13

(7th Cir. 1985)). Plaintiff suggests that even though this claim is titled "Interference with Contract," that, to avoid this issue, the Court should construe it as a tortious interference with prospective economic advantage. [14, at 10]. The Court agrees, as "a complaint need not set forth any legal theories, and a plaintiff 'cannot plead herself out of court by citing to the wrong legal theory or failing to cite any theory at all.'" *Meyers v. Wal-Mart Stores E., LP*, 2020 WL 5642194, at *1 (S.D. Ind. Sept. 18, 2020) (quoting *Ryan v. Illinois Dep't of Child. & Fam. Servs.*, 185 F.3d 751, 764 (7th Cir. 1999)).

That said, even construing Plaintiff's complaint as alleging tortious interference with a prospective economic advantage, it is nonetheless preempted by ERISA. "The elements of this tort are: (1) a reasonable expectation of entering into a valid business relationship; (2) defendants' knowledge of this expectation; (3) defendants' purposeful interference that prevents the plaintiff's legitimate expectation from becoming a valid business relationship; and (4) damages." *Cody*, 409 F.3d at 859. In contrast to the promissory estoppel claim, the Court must determine whether the services Plaintiff provided the patients were covered under the Plan in order to determine whether Plaintiff's expectation of entering into a valid business relationship with the patients was reasonable. See *Advanced Physicians, S.C. v. Nat'l Football League*, 2019 WL 5085335, at *2 (N.D. Ill. Oct. 10, 2019 (explaining that the provider's reasonable expectation "depends on establishing its right to payment under the plan, and since the assessment of [the provider's] expectation requires interpreting a federally regulated contract, the claim cannot exist 'independently' of ERISA); see also *Tomczyk v. Blue Cross & Blue Shield United of Wis.*, 951 F.2d 771, 777 (7th Cir. 1991) (finding tortious interference claim preempted by ERISA). Plaintiff insists she can avoid this conclusion because she alleged that Defendant "engaged in activity unrelated to its interpretation of the plan," such as telling the patients not to see her and sending

14

detached check stubs. However, Plaintiff does not explain how these allegations relate to the elements of the claim or negate her burden of alleging reasonable expectation. Because Plaintiff's tortious interference claim would require the Court to interpret and apply the Plan, it is preempted by ERISA.

### E. Remaining Claims

Defendant argues that the remaining claims are preempted by ERISA. [9, at 4–7]. Plaintiff makes no argument regarding her claims for (1) breach of contract, (2) vexatious delay and bad faith and request for damages under section 155 of the Illinois Insurance Code, (3) breach of fiduciary duty, and (4) equitable relief based on a breach of fiduciary duty. Accordingly, Plaintiff has forfeited any argument that these claims are not preempted by ERISA. See *Republic Techs. (NA), LLC v. Falak Tobacco, Inc.*, 2020 WL 5249116, at *2–3 (C.D. Ill. June 8, 2020). Moreover, Defendant provides good reason to find these claims preempted. Plaintiff's breach of contract claim alleges that Defendant violated the Plan by failing to pay benefits as the Plan prescribes; the Court would need to interpret and apply the Plan when considering this claim. Next, courts routinely find that ERISA preempts claims seeking damages under section 155 of the Illinois Insurance Code. See *Advanced Ambulatory Surgical Ctr., Inc.*, 2014 WL 4914299, at *3 (listing cases). Finally, in her breach of fiduciary duty claims, Plaintiff alleges that Defendant failed to administer the terms of the Plan in the best interest of the beneficiaries. [1-1, at ¶ 59]. In order to determine whether Defendant properly administered the Plan, the Court would need to interpret and apply the plan. See *Di Joseph v. Standard Ins. Co.*, 776 F. App'x 343, 347 (7th Cir. 2019) (finding that the plaintiff's breach of fiduciary duty claim based on the theory that the defendants improperly denied benefits was preempted by ERISA). Accordingly, Plaintiff's four remaining claims are preempted by ERISA. See *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041

(7th Cir. 1999) ("If [judges] are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.).

### F. Supplemental Jurisdiction and Leave to Amend

At this point, the only claims remaining is a portion of Plaintiff's promissory estoppel claim. However, this is a state-law claim. "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). "Dismissal without prejudice of the state law claim[] * * * is appropriate here because the case is only at the motion to dismiss stage and substantial judicial resources have not been committed to the" claim. *Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839, 851 (N.D. Ill. 2013). Accordingly, the Court dismisses the surviving portion of Plaintiff's promissory estoppel claim without prejudice. Finally, in her response, Plaintiff asks for leave to amend her complaint, explaining that it "can be restyled" to being claims under ERISA. [14, at 15]. Plaintiff may refile her complaint, making any claims that are consistent with this order.

## IV. Conclusion

For the reasons stated below, Defendant's motion [8] is denied in part and granted in part. However, only a state-law claim remains, and the Court declines to exercise supplemental jurisdiction. All claims in Plaintiff's complaint are dismissed without prejudice. The Court gives Plaintiff leave to file an amended complaint no later than July 9, 2021 if she can do so consistent with this opinion. This case is set for a telephonic status hearing on July 15, 2021 at 9:00 a.m.

Dated: June 8, 2021                                          _____
                                                             Robert M. Dow, Jr.
                                                             United States District Judge